1  Gregory G. Petersen, Esq., SBN 77744
   gpetersen@petersenlawfirm.com
2  Elizabeth A. Barker, Esq., SBN 74112
   ebarker@petersenlawfirm.com
3  **THE PETERSEN LAW FIRM**
   A Law Corporation
4  3100 Airway Avenue, Suite 109
   Costa Mesa, CA 92626
5  Telephone:  (949) 335-1300
   Facsimile:  (714) 850-0274
6
   Attorneys for Plaintiff
7  Deanna Michelle Mory

8

9                    **UNITED STATES DISTRICT COURT**

10        **SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO**

11

12  DEANNA MICHELLE MORY,              Civil No. 07-CV-0462-JLS (WVG)

13                                     Assigned for all purposes to:
                                       The Hon. Janis L. Sammartino, Ctrm. 6
14
                                       **PLAINTIFF DEANNA MICHELLE**
15          Plaintiff,                 **MORY'S OPPOSITION TO CITY OF**
                                       **CHULA VISTA'S MOTION FOR**
16                                     **SUMMARY JUDGMENT**

17          vs.                        **(Fed. R. Civ. Proc., Rule 56)**

18                                     [Filed concurrently with Declarations of
                                       Elizabeth A. Barker, Deanna M. Mory, and
19                                     Oliver Lee Drummond in Support of Plaintiff's
   CITY OF CHULA VISTA,                Opposition to Motion for Summary Judgment]
20
                                       DATE:      September 16, 2010
21                                     TIME:      1:30 p.m.
                                       CTRM:      6
22          Defendants.
                                       Complaint filed:  March 13, 2007
23

24

25

26

27

28

# TABLE OF CONTENTS

**Subject**                                                                                    **Page**

TABLE OF CONTENTS                                                                                  i

TABLE OF AUTHORITIES                                                                              ii

I.      INTRODUCTION                                                                              1

II.     REBUTTAL TO CITY'S STATEMENT OF FACTS                                                    1

III.    SUMMARY JUDGMENT STANDARD                                                                5

IV.     ARGUMENTS                                                                                5

        A.      Time Spent Donning and Doffing is Compensable                                   5

                1.      General Rules for the FLSA                                               6

                2.      The Standard Police Uniform                                             7

                3.      Standard Law Enforcement Equipment
                        (Worn/Affixed/Carried with the Uniform)                                 8

        B.      Homework, Equipment/Uniform Maintenance,
                Shooting Practice, and Physical Fitness is Compensable                          20

        C.      Plaintiff is Entitled to Overtime for Writing Reports
                and Preparing for Court                                                         23

V.      CONCLUSION                                                                              25

////
////
////
////
////
////
////
////
////
////
////
////
////

1

## TABLE OF AUTHORITIES

2

### CASES

3   <u>Case</u>                                                           <u>Page</u>

4   <u>Alvarez v. IBP, Inc.</u>,                                     12, 16, 17
    339 F.3d 894
5   (9th Cir. 2003)

6   <u>Armour & Co. v. Wantock</u>,                                           6
    323 U.S. 126 (1944)

7   <u>Bamonte v. City of Mesa</u>,                                  3, 5, 6, 16
    598 F.3d 1217
8   (9th Cir. 1210)

9   <u>Banks v. City of Springfield, C.D. Ill.</u>,                     20, 22
10  959 F. Supp. 972 (1997)

11  <u>Barrentine v. Arkansas-Best Freight System, Inc.</u>,                2
    450 U.S. 728,
12  101 S. Ct. 1437 (1981)

13  <u>Celetex Corp. v. Catrett</u>,                                         5
    477 U.S. 317 (1986)

14
    <u>Flowers v. State Personnel Board</u>,                                23
15  174 Cal. App. 3d 753 (1985)

16  <u>Forester v. Roth's IGA Foodliner, Inc.</u>,                          19
    646 F.2d 413
17  (9th Cir. 1981)

18  <u>Lemmon v. City of San Leandro</u>,                                   20
    539 F. Supp. 2d 1200
19  (N.D. Cal. 2007)

20  <u>Lindow v. United States</u>,                                       3, 24
    738 F.2d 1057
21  (9th Cir. 1984)

22  <u>Local 246 Utility Workers Union of America v.</u>
    <u>Southern California Edison Company</u>,                              2
23  83 F.3d 292
    (9th Cir. 1996)

24
    <u>Maciel v. City of Los Angeles</u>,                                  16
25  569 F. Supp. 2d 1038 (2008)

26  <u>Martin v. City of Richmond</u>,                                   15, 17
    504 F. Supp. 2d 766
27  (N.D. Cal. 2007)

28  <u>Matsushita Electric Industrial v. Zenith Radio Corp.</u>,           5
    475 U.S. 574 (1986)

Mumbower v. Callicott,
526 F.2d 1183
(8th Cir. 1975) .............................................. 19

Oakland Police Officers Assoc. v. City of Oakland,
30 Cal. App. 3d 96 (1973) .............................. 6, 13

Perez v. Mountaire Farms, Inc.,
610 F. Supp. 2d 499 (2009) .......................... 19

Steiner v. Mitchell,
350 U.S. 247 (1956) ..................................... 12, 17

Tennessee Coal, Iron and R. Co. v. Muscoda Local No. 123,
321 U.S. 590 (1944) ...................................... 6

Truslow v. Spotsylvania County Sheriff,
783 F. Supp. 274
(E.D. Vir. 1992) ............................................ 5, 13

Turner v. City of Philadelphia,
262 F.2d 222
(3d Cir. 2001) .............................................. 6

**CODE**

| **Code** | **Page** |
| --- | --- |
| 29 U.S.C. § 203(g) | 1 |
| 29 U.S.C. § 206 | 6 |
| 29 U.S.C. § 207 | 6 |
| California Labor Code § 2802 | 4 |
| California Labor Code § 3213.2 | 18 |
| Labor Code § 6401 | 18 |
| Government Code § 6254(a) | 5, 12, 13 |
| Government Code § 19850 | 18 |
| Government Code § 50081 | 5 |
| Government Code § 50081(b) | 5, 12, 13 |
| Government Code § 50082 | 13 |
| Penal Code § 830.10 | 12, 13 |
| | 5, 7, 12 |

////

////

# REGULATIONS

| Regulation | Page |
|---|---|
| 29 C.F.R. § 553.226 | 20, 22 |
| 29 C.F.R. § 776.6 | 16 |
| 29 C.F.R. § 785.13 | 19 |
| 29 C.F.R. § 790.8(a) | 13-14 |
| 29 C.F.R. § 790.8(c) | 19 |

//// //// //// //// //// //// //// //// //// //// //// //// //// //// //// //// //// //// //// //// ////

1  TO THE HONORABLE COURT AND TO DEFENDANT AND ITS COUNSEL OF

2  RECORD:

3  Plaintiff, Deanna Michelle Mory ("Mory" or "Plaintiff"), submits the following

4  Memorandum of Points and Authorities in support of her opposition to the City of Chula Vista's

5  ("City" or "Defendant") Motion for Summary Judgment as to Plaintiff's Second Cause of Action

6  as follows:

7  **I.    INTRODUCTION**

8  Plaintiff has not been paid under the Fair Labor Standards Act ("FLSA") for the time that

9  her employer suffered or permitted her to work [29 U.S.C. § 203(g)], which work was performed

10  after her scheduled work hours, which failure was willful.

11  **II.    REBUTTAL TO CITY'S STATEMENT OF FACTS**

12  It is not disputed that Mory was hired by the Chula Vista Police Department ("CVPD") as

13  a police trainee on April 22, 2005 [Motion for Summary Judgment ("MSJ"), p. 2:25-27], and was

14  on probation for the first 18 months that she worked. (MSJ, p. 2:27-28).  During the first six

15  months, Mory attended the Police Academy, from which she graduated in October 2005.  (MSJ,

16  p. 3:1-2).  At that time, Mory began her field training with the CVPD until May 2006.  (MSJ,

17  p. 3:2-3).

18  It does not appear to be disputed that Mory worked more than 40 hours a week; nor that

19  she was not paid for said work, only that by law, the City claims that she is not entitled to be paid.

20  Plaintiff disputes these legal contentions and notes that they only apply under narrow

21  circumstances, if ever.

22  While all CVPD police officers are expected to know what is in the Department Manual

23  (MSJ, p. 3:27-28), the "State of the Watch" Information and Expectations goes on to say the

24  officer should, "review the most commonly used sections, i.e., use of force, pursuits, hot stops,

25  responding to felony calls, calls for service, and, of course, standards of conduct and

26  responsibilities" (Turner Decl., Ex. B, p. 8).  There is even a section called, "The Big Four

27  Policies."  The policies regarding overtime are not mentioned.  The next to the last sentence

28  acknowledges that every word of the policies will not be committed to an officer's memory.  The

Case 3:07-cv-00462-JLS-WVG Document 215 Filed 08/12/10 PageID.4854 Page 7 of 30

1   document states, "Once again, if you do not know, ask your supervisor." <u>Id</u>.

2       As the City well knows, a Memorandum of Understanding ("MOU") does not control over

3   the FLSA, <u>if</u> the MOU is less generous than the FLSA. <u>Barrentine v. Arkansas-Best Freight</u>

4   <u>System, Inc.</u>, 450 U.S. 728, 101 S. Ct. 1437, 1445 (1981); <u>Local 246 Utility Workers Union of</u>

5   <u>America v. Southern California Edison Company</u>, 83 F.3d 292 (9th Cir. 1996). Therefore,

6   pointing to the MOU as authority for the proposition that it is okay to violate the FLSA avails the

7   City nothing and, actually amounts to a party admission against interest. The MOU states that, "In

8   no event will an employee be paid for less than 5 minutes. Periods of time less than 15 minutes

9   will be disregarded and may not accumulate." (Turner Decl., Ex. C, p. 17, II) referring to

10   holdover time beyond the regular shift. It thus clearly appears that officers are actually

11   discouraged from putting in an overtime slip for overtime less those amounts of time under any

12   circumstances and, in fact, for anything less than one-half hour. So it is clear that the employee

13   would not be paid in these cases. This discouragement came both by way of the MOU sections

14   just quoted (<u>Id</u>.) and also the training received by the FTO's. (<u>See</u> Mory Decl., ¶ 6). Of the 106

15   overtime slips that Mory turned in while she worked for the CVPD, only three or 3% are for three-

16   quarters of an hour and nine or 9% are for one-half hour. There is no overtime slip for less than

17   one-half hour of time worked. Mory was <u>also</u> told to just forget anything less than one-half hour.

18   (<u>Id</u>.)

19       The MOU is clear that it is only actual court time and "actual travel time required" that is

20   covered by the City's court time policy. There is <u>no</u> mention of court preparation time. (Turner

21   Decl., Ex. C, p. 17, III). This is reiterated in the Chula Vista Police Department Policy and

22   Procedure Manual ("P&PM") (Turner Decl., Ex. D, p. 30, II, A, 3). Even a brief look at the

23   overtime form that the officers must fill in, also shows that there is no place to track time for

24   preparation for an appearance in court. Mory never put in for preparation time. (Mory Decl., ¶ 7).

25   Only the time actually in court and travel time to and from court are listed. (<u>See</u> Turner Decl.,

26   Ex. F). There is a box for a three-hour minimum and total time travelled. In practice, the court

27   time begins when the officer checks in with the District Attorney at the courthouse and ends when

28   the District Attorney excuses the officer. Travel time was limited to one-half hour total, no matter

Plaintiff's Opposition to Defendants' Motion for Summary Judgment

2

1    how long it actually took to get to the courthouse and back (Mory Decl., ¶ 7) despite what the

2    form says. There are unwritten rules at CVPD that are taught by example and field training

3    officers that are stronger than written policies and followed by the officers. (Drummond Decl.,

4    ¶¶ 46-55).

5           While the P&PM refers to preparation for a court appearance (See Turner Decl., p. 30, II,

6    B, 2) that is not what was taught probationary Officer Mory; nor is it reflected in the MOU or the

7    request for overtime slip used by the officers to be paid overtime. (Turner Decl., Ex. F). The real,

8    although unwritten, rule is that preparation time for court was not recorded on the overtime slips

9    that are turned in and from which the officers are paid.

10          The fact that Mory submitted overtime slips does not prove that all overtime performed by

11   Mory was paid, just that overtime slips for some activities, which were one-half hour or longer,

12   were approved by the CVPD for payment. Overtime slips are not necessary for payment of

13   overtime when the employer knows the employee is working. Lindow v. United States, 738 F. 2d

14   1057, 1061 (9th Cir. 1984).

15          Mory admits that the report writing, one-half hour or more, was documented, turned in on

16   overtime slips and that she was paid for same. However, for report writing under one-half hour,

17   whether done at work or at home, she was told not to turn in an overtime slip and was not paid.

18   (Mory Decl., ¶ 6).

19          The City states correctly that the CVPD allows their officers to don and doff at home. In

20   relying on this to support its not having to pay overtime for donning and doffing, the City

21   misapprehends the holding in Bamonte v. City of Mesa, 598 F.3d 1217 (9th Cir. 1210), as will be

22   discussed in greater detail hereafter.

23          While there may be no requirement as to how often an officer must clean his or her

24   uniform, there is a requirement that it be clean every day. The P&PM states, "Uniformed

25   personnel shall keep their uniforms clean, and pressed. Badges, name tags and brass shall be kept

26   clean and bright and leather gear/shoes cleaned and well polished." (See Turner Decl., Ex. D,

27   p. 23, I, E). At the Academy, there were rigorous daily uniform inspections that required daily

28   changing and cleaning of uniforms. [Declaration of Elizabeth A. Barker ("Barker Decl."),

1    Deposition of Deanna Mory ("Mory Depo."), Ex. 1, pp. 28:6-19 and 31:11-22].

2        The new trainee officers were inspected daily by FTO's. Mory then changed uniforms

3 every other day, unless something occurred requiring more frequent changes. After probation

4 ended, Mory changed her uniform weekly, barring unforeseen circumstances. The Department

5 does give its sworn officers, who are POA members, $300.00 per year for cleaning their uniforms.

6 Mory's last uniform payment was only for $75.00. (Turner Decl., Ex. J., p. 183). That is nice, but

7 does not include the time to iron, starch, polish brass and leather, and transfer nametags and

8 badges from one uniform to the other. This helps defray the cost of dry cleaning, starch, polish,

9 etc., and replacing worn uniforms. Because of this stipend, Mory did not sue the City under

10 California Labor Code § 2802.[1]

11        Since beginning work at the CVPD, Mory's training for shooting her gun has been almost

12 exclusively on duty and paid for by the CVPD. That was not the case when she was at the

13 Academy. The Academy would reserve time at the Otay range on the weekend and tell the

14 recruits of the date and time the range had been reserved. They were also told that the Academy's

15 shooting instructor would be at the range during that timeframe. Each of the cadets took those

16 announcements as orders to be at the range to practice shooting on those weekend dates. (Barker

17 Decl., Mory Depo., Ex. 1, p. 46:1-9 and Mory Decl., ¶ 4). Mory went, as did every other member

18 of the Academy, to the range to practice when the Academy had reserved time and provided an

19 instructor. (Id.) Being a good marksman serves the officer and the Department, as well as the

20 community. It means that when an officer is in a situation requiring the use of deadly force, the

21 police officer is more likely to hit what he is shooting at and not inadvertently hit an innocent

22 bystander or piece of property. This reduces the risk of unintended injury to innocent members of

23 the community and/or their property. It also keeps the Department's risk of lawsuits for such

24 injury at a minimum, as well as increasing the chances of apprehending suspects and keeping the

25 highly trained police officers alive and well.

26        Physical training may not have been required by the Academy for some cadets (MSJ,

27

28    [1]      The Court should note that there is no Exhibit K to Turner's Decl.

---

1   p. 8:4-5), but it was required of Mory.  (Barker Decl., Mory Depo., Ex. 1, p. 31:1-10).  She had to

2   turn in logs to Matt Smith of the CVPD of her off-duty running and physical fitness on a weekly

3   basis.  (Barker Decl., Mory Depo., Ex. 1, p. 31:23-33:14).  This <u>was</u> <u>required</u> of her and not

4   discretionary on her part.  It was not compensated time.  The cadets at the Academy were only

5   allowed to turn in overtime slips when they were told they could; were given the forms to fill in

6   and turn in, which happened on rare occasions.  (Barker Decl., Mory Depo., Ex. 1, pp. 9:20-23 and

7   23:7-24, and Turner Decl., Ex. F, p. 44).

8   **III.    SUMMARY JUDGMENT STANDARD**

9          The burden is indeed on the moving party to show that there are no genuine issues of

10  material fact.  <u>Celetex Corp. v. Catrett</u>, 477 U.S. 317, 323-324 (1986).  For purposes of summary

11  judgment, facts, and the reasonable inferences therefrom, must be viewed in the light most

12  favorable to the non-moving party.  <u>Truslow v. Spotsylvania County Sheriff</u>, 783 F. Supp. 274

13  (E.D. Vir. 1992).  The moving party for a summary judgment has the burden of demonstrating that

14  "the record taken as a whole could not lead a rational trier of fact to find for the [police officer]."

15  <u>Matsushita Electric Industrial v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The documents

16  and evidence in this case all establish that there are genuine issues of material fact and that this

17  matter must be tried.

18  **IV.    ARGUMENTS**

19      **A.    Time Spent Donning and Doffing is Compensable**

20         The City relies on the <u>Bamonte</u> case for the proposition that donning and doffing is not

21  compensable.  The City's reliance is misplaced.  The <u>Bamonte</u> case states, "[W]e concluded that

22  donning and doffing of police uniforms and gear are not compensable under the <u>contextually-</u>

23  <u>specific facts of this case</u>." <u>Bamonte</u>, <u>supra.</u> at p. 1231.  (Emphasis added.)  In the <u>Bamonte</u> case,

24  there was <u>no</u> evidence presented that showed that there was a benefit to the employer of donning

25  and doffing.  <u>Id.</u>, p. 1221.  (Emphasis added.)  That is not the case here.  There, the officers were

26  employed in the State of Arizona.  Here, the officer is employed in the State of California where

27  there are very different laws.  Moreover, the safety equipment worn by police officers in the State

28  of California, as well as their badge and nametag, are mandated by statute.  <u>See</u>, Government Code

1   §§ 50081 and 19850, Labor Code § 6401, and Penal Code § 830.10.  There is nothing about

2   wearing those items that is benefitting the employee – it is the employer that imposes the

3   obligation to cause the employee to wear the uniform and equipment.  Safety gear must be

4   provided.  <u>Oakland Police Officers Assoc. v. City of Oakland</u> (1973) 30 Cal. App. 3d 96.

5           **1.    General Rules for the FLSA**

6           It is axiomatic under the FLSA that employers must pay employees for "all hours

7   worked."  <u>See</u>, 29 U.S.C. §§ 206, 207; <u>Turner v. City of Philadelphia</u>, 262 F.3d 222, 224 (3d Cir.

8   2001).  The threshold question in this case is whether the activities cited by the plaintiff – donning

9   and doffing, constitute "work" under the FLSA.  Under the facts presented by this case, they do.

10          "Work," the Supreme Court has long noted, is "physical or mental exertion

11  (whether burdensome or not) controlled or required by the employer and pursued necessarily and

12  primarily for the benefit of the employer."  <u>See</u>, <u>Tennessee Coal, Iron and R. Co. v. Muscoda</u>

13  <u>Local No. 123</u>, 321 U.S. 590, 598 (1944).  Definitionally, incorporative, <u>Muscoda</u>'s "work" term

14  includes even non-exertional acts.  <u>See</u>, <u>Armour & Co. v. Wantock</u>, 323 U.S. 126, 133 (1944)

15  (noting that even "exertion" is not the sine qua non of "work" because "an employer…may hire a

16  man to do nothing, or to do nothing but wait for something to happen").  Plaintiff's donning and

17  doffing, as well as the attendant retrieval of safety equipment, constitute "work" under <u>Muscoda</u>

18  and <u>Armour</u>'s catholic definition: "pursued necessarily and primarily for the benefit of the

19  employer."  <u>Muscoda</u>, <u>supra</u>, p. 598.  These tasks are activity, burdensome or not, performed

20  pursuant to CVPD's mandate for CVPD's benefit as an employer.  <u>Armour</u>, <u>supra</u>, p. 133.  The

21  activities, therefore, constitute "work."  Even the <u>Bamonte</u> case admits that the police uniform and

22  safety gear are indispensible to the job.  <u>Bamonte</u>, <u>supra</u>, p. 1228.

23          Arizona law does not mandate that the officers be uniformed in the City of Mesa

24  whereas California law requires that police officers be uniformed and that their vehicles be

25  distinctively marked.  The law and the employer require that the officers wear a uniform every day

26  at work.  In fact, they must arrive at roll call "ready to go to work."  That means, "a clean uniform

27  [and] shined shoes." (Turner Decl., Ex. B, p. 9).  The officers must be ready to go into service in

28  the field "immediately after roll call ends."  <u>Id</u>.  The officers are not allowed to go their personal

1   vehicles after roll call to transfer equipment, Id., but in no event may the officer take longer than

2   10 minutes past the end of briefing to be in the field.  Id.  Therefore, although the officers must be

3   completely ready to work upon arrival at briefing, the time to start for paying wages commences at

4   the beginning of the briefing.  Therefore, all of the work done prior to briefing is not compensated

5   by the employer, and yet required by him by policy and California law.

6               2.     **The Standard Police Uniform**

7                     a.     Regarding the traditional law enforcement uniform, most agencies

8   require a standard (Class A and Class B) wool uniform, which necessitates regular dry cleaning

9   and maintenance.  Class A uniforms usually consist of a long-sleeved shirt/blouse and tie.  Most

10  civilians are unaware that to properly hold the uniform tie (clip-on) and collar in place, a metal

11  "stay down" device is used.  (Drummond Decl., ¶ 12).

12                    b.     All California law enforcement uniforms require a badge with

13  identification number and/or nameplate.  Penal Code § 830.10.  Additional rank or unit insignias,

14  along with service metals, shooting badges and other authorized uniform identification/recognition

15  devices require specific and proper measurement/placement on the uniform in accordance with

16  Department policy.  All of these items require maintenance, attention to detail, specification and

17  time to prepare and properly align/affix on the uniform.  Most wool uniforms also require lint

18  rollers, tape or brushes to remove lint.  (Id.)

19                    c.     Other uniform items include, but are not limited to: regulation

20  underwear, footwear, and gloves, Department insignia/patch, uniform jacket, uniform hat with cap

21  piece device, riot helmet with face shield, and rain gear.  (Id.)

22                           Penal Code § 830.10 mandates that "every uniformed peace offer

23  shall wear badge, nameplate or other device which bears clearly on its face the identification

24  number or name of the officer."  (Emphasis added.)  The City not only wants its officers in

25  uniform at the start of shift looking professional, they also want each officer to "present a

26  professional image; your patrol car, your uniform, your equipment, your shoes and overall

27  personal grooming.  We want to look sharper after 10 hours than the other agencies look when

28  they break lineup!"  (See, Turner Decl., Ex. B, p 6.)  Therefore, CVPD officers are required to

1  keep their uniforms in extra-professional looking appearance.

2      **3.**    **Standard Law Enforcement Equipment (Worn/Affixed/Carried with**

3      **the Uniform)**

4      a.    In addition to the customary law enforcement uniform, standard

5  safety equipment consists of body armor (ballistic vest), Sam Browne (gun) belt, OC spray with

6  carrier holder/case, radio with carrier holder/case, impact weapon with baton ring/holder,

7  handcuffs, handcuff case(s) and key(s), handgun, handgun holster, ammunition, magazines and

8  ammunition carrier, Taser, Taser holster, and flashlight.  (Drummond Decl., ¶ 13).

9      b.    Law enforcement equipment carried by an officer in uniform

10  provides the means by which a peace officer can defend himself or herself and others.  These

11  means include specialized equipment and weaponry requiring continuous training and skill in

12  order to properly exercise necessary force to overcome dangerous or hazardous situations and/or

13  individuals.  (Id.) Each item of equipment is essential in its nature, design and purpose as follows:

14      (1)    Duty/Backup Weapon(s) – The peace officer's firearm is

15  designed for deadly force and self-protection.  Perhaps, the most vital and dangerous of all law

16  enforcement equipment, particularly if not properly engaged, secured in the holster or stored off

17  duty.  Police handguns typically consist of large caliber, semi-automatic pistols or revolvers,

18  designed to be carried on the person, both on and off duty.  Ammunition is customarily chambered

19  in the weapon(s), which are fully loaded at all times while on duty and/or in the ready.  Service

20  firearms require regular inspection, cleaning and maintenance.  [Id., ¶ 13(a)].

21      (2)    Duty Holster – Secures the handgun on the gun belt.

22  Holsters are designed to be affixed to the duty belt and strategically positioned for weapon

23  accessibility/retention/security and protection of the firearm from the elements.  [Id., ¶ 13(b)].

24      (3)    Backup Holster – Secures the backup weapon, concealed, on

25  the officer's person.  [Id., ¶ 13(c)].

26      (4)    Duty Belt – This is an extra-thick, wide, and large belt that

27  equipment holders (such as the holster, ammunition carrier, baton ring, etc.) are affixed to.  The

28  belt must be properly sized, adjusted, balanced, and fitted to ensure correct positioning,

1   accessibility, and security of attached equipment.  Improper fit and/or extended wear may result in

2   back or muscle injury/fatigue.  The duty belt is worn over the uniform trouser belt and held in

3   place with belt keepers (usually four) that assist in securing the duty belt and various affixed

4   equipment.  [Id., ¶ 13(d)].

5                       (5)      Belt Keepers – These are snap strips that go underneath the

6   trouser belt and around the duty belt, securing the equipment to the officer.  [Id., ¶ 13(e)].

7                       (6)      Ammunition – Not only is the duty weapon loaded, but

8   additional ammunition is required to be carried on the equipment belt.  Ammunition can be

9   dangerous if not properly handled or secured.  [Id., ¶ 13(f)].

10                      (7)      Ammunition Carrier/Pouch – This is a holder that secures

11  multiple loaded magazines to duty belt.  [Id., ¶ 13(g)].

12                      (8)      Magazines – Typically, two extra loaded magazines are

13  required to be carried on the duty belt.  In addition to maintaining fully loaded duty and backup

14  firearms, an officer must regularly inspect weapon magazines to ensure they are fully loaded and

15  serviceable.  [Id., ¶ 13(h)].

16                      (9)      Impact Weapon – Commonly referred to as the "police

17  baton."  This weapon is carried on the duty belt in an attached ringed holster.  This is a very

18  effective defensive weapon in the hands of a skilled officer in subduing a combatant or gaining

19  control of a situation.  The mere drawing of the baton and assuming a defensive or combative

20  stance often defuses aggression.  Being armed with a baton gives an officer confidence in knowing

21  a less-than-lethal option is immediately available for violent confrontations.  [Id., ¶ 13(i)].

22                      (10)     Baton Ring – Rings are affixed to a strap, which is slid onto

23  the duty belt.  [Id., ¶ 13(j)].

24                      (11)     Mace/Pepper Spray – Most officers currently carry Oleoresin

25  Capsicum ("OC") aerosol projectors/canisters as essential less-than-lethal weaponry in their

26  inventory of uniform equipment.  OC is a standard option available to an officer in lieu of deadly

27  force and essential for temporarily disabling a combatant.  It is essential that OC spray be properly

28  carried to avoid accidental discharge.  [Id., ¶ 13(k)].

1                     (12)    OC Canister Holders – The importance of the holder is that it

2   correctly positions the weapon in the holder to prevent accidental discharge, while affording the

3   officer ready access to the agent when needed.  The holder is slid on or fastened to the duty belt.

4   [Id., ¶ 13(l)].

5                     (13)    Handcuffs – These metal dual bracelet-type restraint devices

6   connected by a short chain, attach/lock to an arrestee's wrists.  Handcuffs are designed to restrict

7   hand and arm movement to prevent assault, injury, escape, etc.  It is standard procedure to

8   handcuff individuals taken into custody as an acceptable practice for officer safety.  Handcuffs are

9   secured in a case attached to the duty belt.  [Id., ¶ 13(m)].

10                   (14)    Handcuff Case – This is a case affixed to the duty belt to

11   secure the handcuffs in a ready position.  [Id., ¶ 13(n)].

12                   (15)    Handcuff Key – The standard handcuff key is necessary to

13   lock and unlock handcuffs.  Most officers carry one or more handcuff keys on their person while

14   in uniform.  Some officers retain this and other keys clipped to a detachable ring secured by a key

15   holder affixed to the duty belt.  Some officers merely retain keys in their uniform trouser pocket to

16   prevent noise.  [Id., ¶ 13(o)].

17                   (16)    Portable Police Radio – Essential for officer safety and

18   instant communication, the portable or hand-held radio serves as the officer's electronic lifeline to

19   the police dispatcher and fellow peace officers.  Critical information, tactical coordination, backup

20   requests, etc., are made possible for the uniformed officer utilizing a portable radio while away

21   from the police vehicle radio.  Standard models attach to a clip or are carried in a case affixed to

22   the duty belt.  Electronic earpieces are also commonly used by peace officers that thread the radio

23   earpiece wire underneath the uniform between the ballistic vest and the uniform shirt/blouse,

24   allowing only a slight portion of the wire to be visible from the collar to the earpiece. [Id., ¶

25   13(p)].

26                   (17)    Ballistic Vest (Body Armor) – This essential piece of

27   modern police equipment has saved the lives of numerous police officers.  The Kevlar-type

28   material is measured and shaped to the officer's torso and and secured with adjustable Velcro

1    straps.  Positioning of the vest is critical to both comfort and safety.  Most departments provide

2    and require the officer to wear the vest while on duty and in uniform.  [Id., ¶ 13(q)].

3                         (18)    Duty Flashlight – A heavy-duty, high intensity, hand-held

4    flashlight is another piece of essential and standard police equipment used during both the day

5    (i.e., search of dark building interiors, sewers, tunnels, etc.) and night tours of duty.  Some officers

6    carry their duty flashlight in a specially designed pocket in the leg of their uniform trousers.  Other

7    officers retain the light in a ring-holder affixed to the duty belt.  [Id., ¶ 13(r)].

8                         (19)    Taser – The electronic Taser weapon is considered less-than-

9    lethal, for effective deployment.  It is designed to temporarily incapacitate/disable an aggressor or

10   combatant.  The Taser resembles a handgun and is carried in a special holster, usually strapped to

11   the leg of the uniformed officer.  The Taser is typically holstered on the opposite leg from the

12   officer's holstered firearm.  This is to avoid confused/inappropriate deployment of either weapon

13   in highly stressful situations.  [Id., ¶ 13(s)].

14                        (20)    Additional equipment commonly carried on the person of a

15   uniformed officer includes, but it is not limited to:  writing pen and pencil, pocket notebook,

16   wristwatch, police whistle, latex gloves, latex glove belt holder, micro-cassette tape recorder, tape

17   recorder belt holster, leather gloves, locking blade and/or boot knife, sunglasses, official ID card,

18   Miranda advisement card, California driver's license, police vehicle keys, and station key.  [Id.,

19   ¶ 13(t)].

20                        c.    The complete law enforcement uniform with equipment requires

21   proper fit, maintenance and inspection to ensure specified attire and uniformity, plus serviceability

22   and function.  (Id., ¶ 14).

23                        The police officer's uniform and equipment is unlike any other

24   uniform for less-risk occupations, such as a waitress, doorman, airline pilot, etc.  The necessity to

25   be armed, similar to that of the military combat soldier, but professionally geared and designed to

26   a civilian environment, is unique to the law enforcement profession.  In addition to uniformity, a

27   properly attired and equipped peace officer represents authority and "command presence,"

28   the first level in the constitutional "Use of Force Continuum" which all police departments must

1  follow. (Id., ¶ 15). In California only peace officer attired in the traditional law enforcement

2  uniform and associated equipment projects a recognizable authority figure with the official

3  capacity, legal power, and physical means to exact that authority, if necessary, as a matter of

4  statute and cannot lawfully act in fundamental functions unless properly attired as required by law.

5  (Id., ¶¶ 15-16). The mere presence of a uniformed officer often deters crime, brings about

6  compliance with the law and/or control of a situation. An officer's overall appearance in this

7  regard is visually assessed and inspected on a daily basis by the public he or she serves, not just by

8  official department inspection and/or supervision. Therefore, "appearance" and "command

9  presences" are commonly evaluated and documented in peace officer performance appraisals.

10  (Id., ¶ 15).

11  This safety equipment is just as essential and necessary or an

12  "integral and indispensable part of that principal activity" as is safety equipment in a meat packing

13  plant. Alvarez v. IBP, Inc., 339 F.3d 894, 898 (9th Cir. 2003) or battery plant employees.

14  Steiner v. Mitchell, 350 U.S. 247, 256 (1956). Here the benefits to the employer are that the

15  employer through its employees has complied with the statutes that require California peace

16  officers to wear badges and nameplates on their uniforms. Penal Code § 830.10. Also, the

17  employee and the employer have complied with the California statutes that mandate cities to

18  purchase for new police officers their safety equipment. Labor Code § 6401 states, "Every

19  employer shall furnish and use safety devices and safeguards, and shall adopt and use practices,

20  means, methods, operations, and processes, which are reasonably adequate, to render such

21  employment and place of employment safe and healthful. Every employer shall do every other

22  thing reasonably necessary to protect the life, safety, and health of employees." The uniforms and

23  safety equipment of the California police officers fulfill that statute-mandated obligation.

24  California Government Code § 50081 mandates local agencies to

25  furnish "each newly hired police officer and deputy sheriff employed full time by the local agency

26  with a service revolver or other suitable pistol, holster, belt and ammunition, a nightstick,

27  handcuffs, rain coats, and rain boots." The caveat is only if the state has made funds available to

28  the local agency pursuant to Government Code § 50082. The State of California also

1  "recommends" that the following items "be provided by local agencies," although not

2  reimbursable pursuant to § 50082: "(1) Off-duty holster. (2) Whistle. (3) Flashlight, flashlight

3  batteries, and flashlight bulb. (4) Chemical mace and chemical mace holder. (5) Utility jacket.

4  (6) Protective vest."  Government Code § 50081(b).

5          In the case of Oakland Police Officers Association v. City of

6  Oakland (1973) 30 Cal. App. 3d 96, the Oakland Police Officers Association filed a writ of

7  mandamus against the City of Oakland to compel them to provide the above-listed safety

8  equipment free of charge pursuant to Labor Code § 6401.  The trial judge's original notice of

9  intended decision was to grant the writ.  Government Code §§ 50081 and 50082 then took effect

10  and the judge changed his intended ruling stating that the new laws limited the local agency's duty

11  under the Labor Code to the extent that the state must provide the funds for the safety equipment.

12  The Court of Appeal reversed that holding stating, "[T]he legislature has expressly recognized that

13  this equipment is necessary for the safety of the employees" [police officers].  Oakland Police

14  Officers Association, supra, p. 101.  The court correctly pointed out that, "The far-reaching and

15  permanent policy of the state in respect of making adequate provision for the safety of employees

16  is a consideration of great weight."  Id., p. 102.  The equipment in question is necessary for the

17  safety of the police officers.  The court held that, "Labor Code § 6401 applies over and above the

18  provisions of Government Code §§ 50081 and 50082."  Id.

19          Maintaining a healthy and safe workforce reduces time off, overtime

20  usage to cover the shifts of those officers who are unable to work due to injury on duty and

21  attendant overtime and/or workers' compensation claims, thus benefiting the employer.

22  (Drummond Decl., ¶¶ 29-34).  It also benefits the employer that its officers are properly equipped

23  with safety equipment to fulfill its mission to serve and protect the populace of its city.  To serve

24  and protect the citizens of the city encompasses a myriad of activities.  (Id., ¶ 22).  Unlike many of

25  the workers in many of the seminal cases deciding whether donning and doffing is compensable,

26  police officers are called upon to perform a wide variety of tasks, many of them dangerous to

27  themselves or others if not done properly.  "An employee may engage in more than one 'principal

28  activity' during the work day.  Moreover, an 'activity' need not predominate over all other

1  activities to be considered a 'principal activity'."  Truslow, supra, p. 277 and see 29 C.F.R.

2  § 790.8(a).  In the case of a police officer, he is performing a principal activity when giving

3  directions to a visitor to city or in a shoot-out with a robber of a convenience store.

4                                       Logic dictates that when an employer requires an employee to wear

5  a uniform, it is because it is of some benefit to the employer, otherwise the employer would not

6  require it of the employee.  It is irrelevant that any of the individual items of safety equipment are

7  not put into use on a daily basis.  What is important is that the safety equipment is there for the

8  officer to use as needed to serve and protect the public.  The uniform and presence of the safety

9  equipment, mandated by the State of California and the local agency as well as by statute,

10  constitute benefits to the employer.  This is because the uniform and the equipment are used for

11  police purposes to achieve the principal activity of the police officers to serve and protect.  The

12  "Use of Force Continuum" refers to the level of force necessary to control a situation, perform an

13  arrest, preserve lives and property or exercise self-defense.  "Command presence" begins with an

14  officer's appearance and demeanor.  A well-groomed, properly uniformed, and equipped officer

15  commands respect and demonstrates the ability to use force, up to and including deadly force.  The

16  "Use of Force Continuum" escalates from a visual perception/compliance (as a result of the mere

17  presence and image of the integration of the law enforcement uniform and associated equipment),

18  to use and forcefulness of verbal commands.  Failure to comply may then result in physical force,

19  such as escorting, restricting movement, physically placing a suspect under arrest, etc.  Should

20  further threat or resistance be encountered, pain-compliance holds or unarmed-defensive tactics

21  may be deployed.  Continued threats or dangerous situations then justify an armed response of

22  less-than-lethal weapons, such as OC spray, police baton, or Taser utilization.  Based upon initial

23  threat assessment or escalated life-threatening circumstances, an officer is trained and equipped to

24  immediately respond accordingly with possible deadly force to neutralize and/or eliminate

25  extreme danger to the peace officer and/or others.  (Drummond Decl., ¶ 16).  A city will face less

26  risk of liability and better community relations the lower on the Use of Force Continuum matter

27  out on the street can be handled.  The higher up the Use of Force Continuum an officer must go to

28  handle a situation, the more likely the city will have a complaint or lawsuit from an unhappy or

1  injured citizen.  (Id., ¶ 17).

2           The test is not whether the employer is the "sole beneficiary," but

3  rather whether the employer derives a significant benefit from the activity.  Compliance with the

4  law is a requirement and that benefits the employer since to do otherwise would be unlawful.  The

5  police officer who was in a near-fatal car accident on his way to work in full uniform and had his

6  gun stolen by a gang member while he was unconscious, or the officer who had a neighbor child

7  go into a closet in the master bedroom and climb up onto the top shelf to get his service revolver

8  to play with and was fatally shot, show the liability to which a department may be exposed when

9  an officer dons and doffs at home.  (Id., ¶ 30).  Again, this is California and not Arizona.

10           As has been noted by the courts in the context of donning and

11  doffing, each case is context-specific.  In the case of meat cutters, it was important to don and doff

12  the protective equipment at the meatpacking facility due to the sterile environment that had to be

13  maintained where the meat cutters worked.  Moreover, the restrictions on a peace office in

14  California are not those of an officer in Arizona and no attempt has been made by the defendants

15  to equate Arizona law and requirements of their peace officers to the more structured and

16  controlled requirements of the State of California.  Thus, while Bamonte may be 9th Circuit law in

17  Arizona it is not 9th Circuit law in California as made clear by the Court (in a 2/3 decision).

18        In this context, the officers may don and doff their police uniforms and equipment at home,

19  but should they choose to do so, an officer must cover up their uniform as they travel to and from

20  their residence.  (Turner Decl., Ex. D, pp. 22-23 and Ex. E, p. 40).  The reason for this is for

21  officer safety.  The City wants the uniform covered, because the City does not want the officer

22  engaged in law enforcement tasks before they are at work and in patrol cars with all of their safety

23  equipment in place.  (Drummond Decl., ¶¶ 20, 30, 36-39).  Therefore, they must conceal their

24  identity as they travel to and from work in their privately owned vehicles.  Martin v. City of

25  Richmond, 504 F. Supp. 2d 766, 768 (2007), and Drummond Decl., ¶ 37.  Motorcycle and K-9

26  officers must don and doff their uniforms at home also for safety purposes.  (Id., ¶ 20).  That is

27  because they travel to and from their residence in marked police vehicles.  They may be called

28  upon, because they are easily identifiable as police officers as they travel to work or from work, to

1  take law enforcement action. They are fully equipped, because motorcycle officers ride their

2  motorcycles to and from work and K-9 officers ride in marked police units so that the canine can

3  be safely transported. Because some officers must don before they go to work does not mean that

4  officers, who may have an option, should not be paid for donning and doffing wherever it occurs.

5  When employees are permitted or suffered to work no matter the location, they must be paid. In

6  fact, 29 C.F.R. § 776.6 expressly provides for FLSA coverage whether employees "perform their

7  work at home, in a factory, or elsewhere."

8            The FLSA was promulgated to compensate employees for all hours

9  worked wherever it occurs when that work is done for the benefit of the employer to engage in

10  primary activities, as is the case here. The opinions of the Department of Labor ("DOL") are

11  "entitled to respect…to the extent that [they] have the power to persuade." Bamonte, supra,

12  p. 1223. Here, the proposition that donning and doffing necessary safety equipment at home is not

13  compensable, if there is an option to do so and the ability to do so, is absurd. It does not take less

14  time to don and doff at home, nor is it less necessary, because it is done at home. Whether the

15  donning and doffing occurs at home or at the Department where lockers are provided by the City

16  for that express purpose (Drummond Decl., ¶ 19), it is still work done for the benefit of the

17  employer and an integral and indispensable activity to perform the duties demanded of the

18  employee by the employer. The employee can listen to music by iPod at either location. The limit

19  on whether or not this type of work should be paid for by the employer is the de minimis test (Id.,

20  p. 224) and here that is not an issue. (See, City's MSJ.)

21            While some of the Bamonte plaintiffs' reasons for donning and

22  doffing at home may have been a personal preference of theirs, there were also legitimate benefits

23  to the employer, as well. (See, Drummond Decl., ¶ 15-18, 20-23, 28-34, 36-39 and 41). Further,

24  "it is beyond cavil that the donning, doffing…and retrieving of protective gear is, at both broad

25  and basic levels, done for the benefit of [the Police Department]." Alvarez, supra, p. 894; and

26  Maciel v. City of Los Angeles, 569 F. Supp. 2d 1038, 1049 (2008). Police officers do not wear

27  protective gear for personal comfort or convenience; they bear the 30-pound load, because of the

28  policy of their employer and the demands of their working environment as well as California law.

1  The Supreme Court of the United States in interpreting the FLSA found that if donning and
2  doffing "fulfilled mutual obligations of employer and employee," and are closely related to other
3  duties performed by the employee, the time was compensable. Steiner v. Mitchell, supra, p. 252.
4  The court went on to say that the Congress "did not intend to deprive employees of the benefits of
5  the Fair Labor Standards Act where they are an integral part of and indispensable to their principal
6  activities." Id, p. 255.  The U.S. Supreme Court came up with no artificial tests with regard to
7  where the activity had to occur or whether or not an option as to the location of where the work
8  was to be performed would have any impact on compensation for work performed at the behest of
9  the employer that was a principal activity.  The intent of the statute was to pay employees for work
10  performed that is integral to the duties the employee performs.  In the debate in the Senate,
11  regarding the passage of the Portal to Portal Act, Senator Cooper stated, "I believe it gives the
12  opportunity of drawing a fine distinction between the type of activity which we consider
13  compensable and the type which should not be compensable.  In accordance with our intention as
14  to the definition of 'principal activity,' if the employee could not perform his activity without
15  putting on certain clothes, then the  time used in changing into the clothes would be compensable
16  as part of his principal activity." Id., p. 258.  That is certainly the case here and the time donning
17  and doffing should be compensable.

18  One of Mory's concerns, which prompted her to don and doff at the
19  Department was the possible contamination of a soiled uniform. Police officers are exposed during
20  any given work shift to hazardous chemicals, infectious and communicable diseases, allergens,
21  bacteria, viruses, blood-borne pathogens, bodily fluids from prisoners and suspects, which can
22  carry such deadly diseases as H1N1 or AIDS.  These may be brought home on an officer's
23  clothing to the officer's family.  It increases the risk of liability to the employee for such second-
24  hand exposure that causes harm.  (Drummond Decl., ¶ 32).

25  Should this Court decide that donning and doffing the uniform alone
26  is not compensable, despite its use to deter crime and for command presence, the donning and
27  doffing of the unique safety equipment, as previously outlined, is. Martin v. City of Richmond,
28  504 F. Supp. 2d 766 (N.D. Cal. 2007) and Alvarez, supra, p. 905.  In the Martin case, the police

1   officers sued for donning and doffing uniforms and duty and safety equipment.  The <u>Martin</u> court

2   found the donning and doffing of the uniform to be non-compensable.  <u>Id.</u>, p. 774.  It also held that

3   the compensability of donning and doffing of safety equipment was a triable issue of fact.  <u>Id.</u>,

4   p. 776.  The court did this, because although the city formally permitted officers to change at

5   home, "the circumstances of their employment do not actually allow them to do so."  <u>Id.</u>, p. 775.

6   The officer's concerns had to do with more than mere "convenience."  One concern was physical

7   injury.  Additional time wearing the ballistic vest and Sam Browne belt "increase[s] the chance of

8   a debilitating [or] career-ending or painful back or knee injury."  <u>Id.</u>  "The California legislature

9   has impliedly recognized the legitimacy of these concerns.  <u>Cf.</u> California Labor Code § 3213.2

10  "providing that the 'lower back impairment' of a 'peace officer' is 'presumed to arise out of and in

11  the course of the employment' in part because of heavy 'duty belt' the officer must wear."  <u>Id.</u>,

12  pp. 775-776.

13          The officers were also concerned about conducting the requisite

14  operational checks on firearms at their homes, creating unnecessary risk of injury to others.

15  Lastly, the officers were concerned about getting dressed at home, because it might subject the

16  officer or the officer's family to retaliatory acts by offenders they had encountered.  Not everyone

17  in a given neighborhood knows that an individual is a police officer and not everyone should

18  know.  Government Code §6254(a) restricts dissemination of information to the public about the

19  "home address and telephone number of peace officers."  <u>Id.</u>, pp. 775-776.  This is all true for

20  Mory.  (<u>See</u>, Mory Decl., ¶¶ 9-11).

21          Traveling to and from work while in uniform can make the officer

22  an identifiable target during the commute.  The employee can be exposed to revenge, reprisal, or

23  vandalism.  (Drummond Decl., ¶¶ 21 and 40).  The CVPD requires the officer to cover the

24  uniform but that does not effectively resolve the officer's safety concerns, since unexpected events

25  may occur during the commute such as a traffic accident that reveal the officer's identity as a

26  police officer.  (<u>Id.</u>, ¶ 37).

27          The Court questioned whether officers "are in effect constrained to

28  do their donning and doffing at work," because the "changing of clothes on the employer's

1   premises is required by law, by rules of the employer, or by the nature of the work. Id., p. 776

2   (emphasis in original) and 29 C.F.R. § 790.8(c), footnote 65, and Perez v. Mountaire Farms, Inc.,

3   610 F. Supp. 2d 499, 519 (2009), where despite a take-home option, the court found that, because

4   the employees were able to and did don and doff in their employer-provided lockers, the time was

5   compensable.  The court found that there was no bona fide option or there would have been no

6   need for the employer to pay for and provide the employees the lockers. Id. "Work not requested

7   but suffered or permitted is work time." Forester v. Roth's IGA Foodliner, Inc., 646 F.2d 413, 414

8   (9th Cir. 1981).  Here, the work is not only requested but demanded by the employer.  Work must

9   be compensated, "even if the employee does not make a claim for the overtime compensation."

10  Mumbower v. Callicott, 526 F. 2d 1183 (8th Cir. 1975).  It is the employer who bears the burden

11  of preventing overtime work when such work is not desired. See, 29 C.F.R. § 785.13.[2]  Here, the

12  employer demands the work be done, he just does not want to pay for it.

13          There are many benefits to the Department from officers donning

14  and doffing at the Department.  P.O.S.T. emphasizes in Domain 21, Chapter 2 (Drummond Decl.,

15  Ex. C), and the importance of psychological preparation prior to the start of duty performance.

16  (Drummond Decl., ¶ 44-45).  Officers must focus on proper attitude and emotions and put aside

17  any personal problems while on duty.  (Id.)  The period of donning in the locker room gives

18  officers a place to make this transition and "psych" up prior to duty.  While doffing officers can

19  unwind and relax.  (Id., ¶ 45).  This enhances performance and safety.  (Id.)

20          Another benefit to the Department from donning and doffing at

21  work is that it builds "esprit de corps" by building cohesiveness among the officers as outlined in

22  the Drummond Declaration.  [Id., ¶ 35 (a)-(c)].

23          Another benefit to the Department for the officers donning and

24  doffing at the Department is that if an emergency occurs just before the beginning of a shift or just

25  as it ends, there are additional officers at the Department who are able to respond.  [Id., ¶ 35 (d)-

26

27  [2]     "In all cases, it is the duty of the management to exercise its control and see that the work
    is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits
28  without compensating for them."

1  (e)].

2          Clearly, the employer knows that the employee is donning and

3  doffing the uniform somewhere, as the officers are required to wear it on duty but not off and are

4  required to show up at briefing in their uniform and gear.  The court in <u>Lemmon v. City of San</u>

5  <u>Leandro</u>, 539 F. Supp. 2d 1200 (N.D. Cal. 2007) found that both the donning and doffing of the

6  uniform and safety equipment compensable under the FLSA.  We believe that the court's

7  reasoning in that case is by far the better reasoning under California law.  Therefore, Mory's

8  donning and doffing of both her uniform and her duty and safety equipment are compensable

9  under the FLSA, and the City's Motion for Summary Judgment must be denied.

10     **B.     Homework, Equipment/Uniform Maintenance, Shooting Practice, and**

11            **Physical Fitness is Compensable**

12          The City relies upon 29 C.F.R. § 553.226 for the proposition that cadets are not considered

13  to be on duty when "they are not in class or at a training session." <u>Id</u>.  The case the City's cites to

14  to uphold this proposition is <u>Banks v. City of Springfield, C.D. Ill.</u>, 959 F. Supp. 972 (1997), is

15  inapposite to the case at bar.  In the <u>Banks'</u> case, the cadets had to live Sunday night through

16  Friday night at a barracks at the police academy.  The cadets were suing to be paid for <u>all</u> time

17  spent at the academy, including sleep time. In this case, the Plaintiff only seeks to be compensated

18  for the time she was suffered or permitted to work by the CVPD.  The court in <u>Banks</u> found that

19  the time not spend in the classroom or in training could be used by the cadet as they desired, i.e.,

20  talking on the phone, watching TV, or studying.

21          The City also relies upon a recent DLSE letter to support their position (MSJ,

22  p. 14:13-28).  That letter is also inapposite.  There, the "trainees" were not employed by the

23  employer. (MSJ, p. 14:17½).  Here, Mory was hired by the City and paid overtime for some

24  activities performed at the Academy.  (Barker Decl., Mory Depo., Ex. 1, pp. 9:20-23 and 23:7-24

25  and Turner Decl., Ex. F, p. 44).  It is inconsistent that the City is required to pay overtime for

26  some of the work and immune from doing so under the law as they claim.  This is a clear factual

27  dispute that the City created and now wants to ignore.

28          In Mory's case, she was required to do physical fitness activities outside of the

1    classroom and to keep track of her time spent so doing on a sheet given to her by her instructors.

2    (Barker Decl., Mory Depo., Ex. 1, p. 31:1-10). She had to turn in the logs every week. (Barker

3    Decl., Mory Depo., Ex. 1, p. 31:9-10). When Cadet Mory did her physical fitness, she was

4    required to do between 30 and 60 minutes of it per night and put it on her log or PT sheet that she

5    handed in to Matt Smith of the CVPD. (Barker Decl., Mory Depo., Ex.1, pp. 31:23-33:14). This

6    was mandated physical fitness training. Even the City admits cadets are "highly encouraged" to

7    do off-duty physical conditioning. (See, Turner Decl., Ex. E, p. 38). Mory was not free during

8    this time to do as she pleased. This physical training was done for the benefit of the City so that

9    their new officer would be physically fit and ready to perform her duties with ease. Therefore, it is

10    compensable under the FLSA.

11        Mory was also mandated to keep her gun clean at all times. [Turner Decl., Ex. E,

12    p. 43 (12.11)]. After the cadets had been shooting during the Academy, the cadets would be told

13    that there would be a gun inspection the next day. (Barker Decl., Mory Depo., Ex. 1, p. 44:1-3).

14    However, per the basic Academy Recruit Policy and Procedures Manual (Turner Decl., Ex. E,

15    p. 43:12-11) states that, "recruits shall clean weapons, to include magazines, after each use, and

16    maintain them in a manner which meets Academy standards. The cleaning of weapons on campus

17    is prohibited." Id. (Emphasis added.) Mory was not free to do as she pleased during that time. It

18    took her 45 minutes to an hour to clean her gun after each use. (Barker Decl., Mory Depo., Ex. 1,

19    p. 45:7-17). While this was done at her home, cleaning a gun takes complete attention to detail in

20    order to do so safely and thoroughly. This training in keeping your duty weapon clean was for the

21    benefit of the Department so that the gun would be operable and so that the cadet would know

22    how to perform the task. Thus, it is compensable under the FLSA.

23        There were daily uniform inspections at the Academy. (Barker Decl., Mory Depo.,

24    Ex. 1, p. 28:6-19). The brass on the uniform had to be polished daily, as did the boots. (Barker

25    Decl., Mory Depo., Ex. 1, p. 28:10-15). The uniform had to have sharp creases that required

26    ironing with starch. (Barker Decl., Mory Depo., Ex. 1, p. 31:11-22). It took one hour every night

27    to prepare the uniform for the next day. Again, this was mandated by the daily inspections, and

28    the Academy and Department knew that the cadet would be required to spend time maintaining

1  the uniform for the benefit of the Department.

2         Defensive tactics are necessary to be used in the field for officer safety, citizen

3  safety, and to apprehend and control suspects.  New cadets must practice these tactics so as to be

4  able to perform this primary activity easily for their job.  Although time was given during the

5  Academy hours to learn and practice defensive tactics, cadets were told they would need to

6  practice outside of class.  (Barker Decl., Mory Depo., Ex. 1, pp. 10:20-23 and 22:7-16).  Mory

7  would meet with classmates and do as she had been told, i.e., practice her defensive tactics.  (Mory

8  Decl., ¶ 5).  Therefore, because it was suffered and permitted by the Academy, her employer's

9  agent, who took no steps to prevent it, the time spent in defensive tactics is compensable.

10         Plaintiff concedes that some of the shooting practice, while not at the Academy,

11  was for her own and the Department's benefit.  Some of the off-duty shooting was actually

12  required.  The Academy would schedule times at the Otay Shooting Range over a weekend, when

13  the instructors would be there to help the cadets practice their shooting.  Not surprisingly, all of

14  the cadets would show up for these shooting sessions.  (Barker Decl., Mory Depo., Ex. 1, p. 46:1-

15  9).  These shooting practices were mandatory not optional for the cadets.  While they were thus

16  engaged in practicing their shooting, they could not engage in other activities of their own

17  choosing.  Mory became more proficient the more she practiced and the Department had a more

18  proficient officer, who was more likely to shoot accurately under stress, which would reduce its

19  liability for things inadvertently hit and hurt by stray gunshots.  The instructor nor the Department

20  ever told her that she was so good that she was not in need of further training with regard to

21  shooting her gun and that she should stop training. Therefore, the time Mory spent training with

22  her gun should be compensable under the FLSA.  The Academy and the CVPD knew of Mory's

23  additional shooting, because they provided her the ammunition.  (Mory Decl., ¶ 4.)

24         Under the Banks case, study time was not found to be compensable.  That case is

25  not the same as this one.  Mostly because Plaintiff is not trying to get every moment of her day

26  recompensed by the City, only the time that she actually spent at home or other places working

27  and in this case studying and doing homework.  There are numerous domains that are taught at the

28  police academy.  Employer provided housing is subject to 29 CFR § 553.226.  At the end of each

1   learning domain, there are practice tests, some of which are multiple choice and some of which are

2   essay. The cadets were not given time to take the tests during class. However, they were told they

3   must take them home and work through the tests on their own time. Again, this was not a choice;

4   this was work given to the cadets to do outside of class. (Barker Decl., Mory Depo., Ex. 1,

5   pp. 24:23-25:21). This was work that was suffered and permitted by the Department who knew

6   about it and expected it. This time was compensable, as it was invested for the Department's

7   benefit with the Department's knowledge. On the first day of class, the cadets were told that they

8   would need to study on their own time. (Barker Decl., Mory Depo., Ex. 1, pp. 22:21-23:6).

9          The City makes much of the fact that no specific order was given that these

10  activities be done on the cadet's own time. That, of course, totally ignores the fact that this is a

11  paramilitary organization. A request by a superior officer is an order. <u>Flowers v. State Personnel</u>

12  <u>Board</u> (1985) 174 Cal. App. 3d 753, 760.

13         As the City correctly points out, the cadets had to clean their guns to always keep

14  them clean and in serviceable condition. (Turner Decl., Ex. E. p. 41). That mandated cleaning the

15  gun after each use of the gun. (MSJ, p. 17:6-8). As previously stated, Mory's shooting practice

16  was for mutual benefit and known to the CVPD. The benefits to the CVPD are many, not the least

17  of which is a well-trained workforce, who is less likely to act in ways that would cause liability for

18  the City and who will also act in ways that enhance the Department's perception in the community.

19  Therefore, the mandated gun cleaning was compensable under the FLSA, not only when the cadets

20  practiced during academy hours, but also when they practiced on the Saturdays with the

21  instructors, as well as when they would practice on their own. Moreover, the City had knowledge

22  of this additional practice time and did not prevent Mory from participating in this shooting

23  practice. (Mory Decl., ¶ 4).

24  **C.    Plaintiff is Entitled to Overtime for Writing Reports and Preparing for Court.**

25         The MOU states that, "In no event will an employee be paid for less than

26  5 minutes. Periods of time less than 15 minutes will be disregarded and may not accumulate."

27  (Turner Decl., Ex. C, p. 17, II) referring to holdover time beyond the regular shift. Officers are

28  discouraged both by way of the MOU section just quoted (<u>Id</u>.) and also the training received by

1    the FTO's from putting in an overtime slip for less than one-half hour. (See Mory Decl., ¶ 6).

2    The MOU is clear that it is actual court time and "actual travel time required" only

3    that is covered by the City's court time policy. There is no mention of court preparation time.

4    (Turner Decl., Ex. C, p. 17, III). This is reiterated in the P&PM (Turner Decl., Ex. D, p. 30, II, A,

5    3). Even a brief look at the overtime form that the officers must fill in, shows that there is no

6    place to track time for preparation for an appearance in court. Mory never put in for preparation

7    time. (Mory Decl., ¶ 7). In practice, the court time begins when the officer checks in with the

8    District Attorney at the courthouse and ends when the District Attorney excuses the officer. There

9    are unwritten rules at CVPD that are taught by example and field training officers that are stronger

10   than written policies and followed by the officers. (Drummond Decl., ¶¶ 46-55).

11   While the P&PM refers to preparation for a court appearance (See Turner Decl.,

12   p. 30, II, B, 2) that is not what was taught probationary Officer Mory nor is it reflected in the

13   MOU or the request for overtime slip used by the officers to be paid overtime. (Turner Decl.,

14   Ex. F). The real, although unwritten, rule is that preparation time for court was not recorded on

15   the overtime slips that are turned in and from which the officers are paid.

16   The fact that Mory submitted overtime slips does not prove that all overtime performed by

17   Mory was paid, just that overtime slips for some activities, of one-half hour or longer, were

18   approved by the CVPD for payment. Overtime slips are not necessary for payment of overtime

19   when the employer knows the employee is working. Lindow, supra, at p. 1061.

20   Mory admits that the report writing, one-half hour or more, was documented,

21   turned in on overtime slips and that she was paid for same. Not so, for report writing under one-

22   half hour. (Mory Decl., ¶ 6).

23   The fact that on occasion, Mory was paid for more hours than she worked for court

24   time pursuant to the MOU, is irrelevant. The question is, "Was she paid for the hours she

25   worked?" While it may be true that on the occasion she was paid for three hours minimum,

26   preparation time may have been included, that is not case for the times she reported her actual time

27   in court and the one-half hour she was allowed for travel time. In those cases, she did not put

28   down any time for her preparation, and, therefore, must be paid for same. Mory never charged for

1   preparation time for going to court when it exceeded the three-hour minimum.  As a matter of law,

2   Mory is entitled to the time she spent writing reports and preparing for court.

3          Interestingly, the City did not even address the issue of Mory not being paid for

4   missed lunch breaks for which she was entitled (Barker Decl., Mory Depo., Ex. 2, pp. 105:8-

5   109:24) nor the pre-shift work besides donning and doffing that Mory had to do, i.e., getting her

6   radio, bringing food for a "Friday" briefing or preparing a presentation for briefing, getting a

7   police car, being sure it had no contraband, that it had gas, and putting in all of her gear that she

8   may need on any given shift nor her post-shift activities of reversing that process.  (Barker Decl.,

9   Mory Depo., Ex. 2, pp. 103:25-105:7).  The evidence the City has produced does not support its

10  claims that as a matter of law Mory did not have her rights violated under the FLSA, rather the

11  facts support Mory's contentions that they were violated.

12  **V.     CONCLUSION**

13         Plaintiff has established that the City violated the FLSA overtime payment requirements

14  by failing to pay her for off-duty work activities that she performed with their sufferance and

15  knowledge.  Therefore, Defendants' Motion for Summary Judgment must be denied.

16  Dated:  August 11, 2010                    Respectfully submitted,

17                                             THE PETERSEN LAW FIRM
                                               A Law Corporation
18

19

20                                      By     /s/Elizabeth A. Barker
                                               Elizabeth A. Barker
21                                             Attorneys for Plaintiff
                                               Deanna Michelle Mory

22

23

24

25

26

27

28

---

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**